UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

CAHKE CORTNER,

    Defendant.

Case No. 3:19-cr-171-MJN-2

District Judge Michael J. Newman

---

**ORDER: (1) GRANTING IN PART AND DENYING IN PART THE REMAINDER OF DEFENDANT'S MOTION TO SUPPRESS (Doc. No. 126); (2) SUPPRESSING THE PORTION OF THE VIDEOTAPED INTERROGATION CONTAINED IN GOVERNMENT'S EXHIBIT 1 FROM 1:20:01 TO 1:21:30 FROM USE IN THE GOVERNMENT'S CASE-IN-CHIEF; (3) DENYING THE MOTION IN ALL OTHER RESPECTS; AND (4) SCHEDULING A TELEPHONE STATUS CONFERENCE WITH COUNSEL ON OCTOBER 25, 2022 AT 10:30 A.M.**

---

Defendant Cahke Cortner ("Cortner") is charged, with two other defendants, in a ten-count superseding indictment for the fatal shooting of DEA Task Force Officer and Dayton Police Department Detective Jorge Del Rio ("Detective Del Rio"). Doc. No. 142. Cortner moved in his motion to suppress, which this Court denied in part, to suppress statements allegedly obtained in violation of *Miranda v. Arizona*. Doc. No. 126 at PageID 583. The Court held a hearing on this portion of Cortner's motion on July 7, 2022. *See* Doc. No. 143. The Court heard testimony from David House, a homicide detective for the City of Dayton Police Department ("Detective House"). *Id.* at PageID 799. The parties also presented video from a camera that recorded Cortner's questioning by Detective House and FBI Special Agent Robert Buzzard ("Agent Buzzard"). Gov't Exh. 1.[1] During the hearing, the Court accepted the parties' exhibits into evidence. Doc. No. 143

---

[1] Citations to exhibits shall be abbreviated as follows: (1) Def. Exh.; and (2) Gov't Exh.

at PageID 837–40. After the hearing, the parties, pursuant to this Court's order, filed post-hearing briefs. *See* Doc. Nos. 141, 144, 146. The motion is now ripe for review.

## I. Underlying Facts

The Court presumes the reader's familiarity with the facts at issue in this case and refers any unfamiliar reader to *United States v. Goddard*, No. 3:19-cr-171, 2022 WL 1569985, at *1–3 (S.D. Ohio May 18, 2022) for a full recitation of the underlying events. Those established facts are incorporated by reference into this opinion. The events pertinent to this motion occurred after the fatal shooting of Officer Del Rio on the evening of November 4, 2019.

### A. The Interrogation

Detective House testified at the suppression hearing that, beginning at 12:55 a.m. on November 5, 2019, he and Agent Buzzard questioned Cortner at the Dayton Police detective section, "located on the second floor of the Safety Building at 335 West Third Street." Doc. No. 143 at PageID 800, 801. An audio-video recording of the questioning was admitted at the hearing. *Id.* at PageID 844. As Detective House testified, Cortner was detained during the questioning, and he was in the room for around 40 minutes. *Id.* at PageID 810.

The video started with Cortner sitting in a chair in the corner of the room where he was questioned, wearing socks without shoes. Gov't Exh. 1 at 52:12. Detective House entered, identified himself and Agent Buzzard, and told Cortner they were going to ask him what happened that night at 1454 Ruskin Road. *Id.* at 52:36; Doc. No. 143 at PageID 802.

Before proceeding further, Detective House told Cortner that he would "read him his [*Miranda*] rights[,]" and asked Cortner if he had ever received *Miranda* warnings. Gov't Exh. 1 at 52:50–:53; Doc. No. 143 at PageID 804. Cortner replied that the police had warned him in past incidents. Gov't Exh. 1 at 52:59–:01; Doc. No. 143 at PageID 804.

Detective House had Cortner recite identifying information, including his name; address;

2

cell phone number; and date of birth. Gov't Exh. 1 at 53:08–54:17. After Cortner answered, Detective House informed Cortner that his interrogation was being recorded. *Id.* at 54:18–:37. Next, Detective House asked Cortner if he had any problems reading or writing, to which he replied that he did not. *Id.* at 55:06–:25. Likewise, Cortner told Detective House that English was his first language. *See id.*

With those preliminary questions out of the way, Detective House then proceeded to walk Cortner through, line by line, the *Miranda* waiver form—listing out each right and describing the consequences of waiver. *Id.* at 55:40–:44. He informed Cortner that his interrogation related to the murder of a police officer, to which Cortner expressed surprise. *Id.* at 55:44–:49. Then, Detective House read to Cortner the provision of the waiver form indicating that Cortner must understand his rights before waiving them. *Id.* at 55:49–:59.

Detective House subsequently had Cortner review each *Miranda* right (either by having Cortner read it aloud or listening to Detective House read it aloud); indicate if he understood that right; and affirm whether he was willing to waive that right by stating so and signing his initials. *Id.* at 55:59–57:27; *see* Gov't Exh. 2. In particular, Detective House explained that, at any point, Cortner could terminate the interrogation and consult with an attorney. Gov't Exh. 1 at 57:07–:21.

Detective House moved next to the "waiver" provision of the form. *Id.* at 57:31. He asked Cortner his education level. *Id.* "I finished high school," Cortner replied, before marking this on the form. *Id.* at 57:31–:45. Finally, Detective House had Cortner read the following out loud:

> The above statement of rights has been read to me. I understand what my rights are. I'm willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion has been used against me.

*Id.* at 57:47–58:20; *see* Gov't Exh. 2.

3

Cortner paused at the word "coercion," before Detective House pronounced it for him. Gov't Exh. 1 at 58:12–:17. Detective House asked Cortner if he knew what "coercion" meant, later testifying that he did this to ensure that Cortner fully understood what he was attesting to. *Id.* at 58:20–:24; Doc. No. 143 at PageID 806–07, 815–16. Cortner answered that it meant, "no one was telling [him] what to say," to which Detective House explained that it also meant no one was forcing or threatening him to talk. Gov't Exh. 1 at 58:24–:34. Subsequently, upon being asked, Cortner agreed that he was not coerced into speaking. *Id.* at 58:36–:53. He then agreed to speak with the officers "to a certain extent[.]" *Id.* at 58:55–59:00.

After Cortner signed the form for a final time, the questioning began. *Id.* at 59:12–:20; *see* Gov't Exh. 2; Doc. No. 143 at PageID 807–08. For the purposes of this opinion, and as clarified by counsel at the hearing, only certain instances from the questioning are at issue in this motion. *See, e.g.*, Doc. No. 143 at PageID 816–17 (describing the questioning as mostly "low-key" while identifying some instances as contentious); *id.* at 836–37 (Cortner's counsel noting there are "three issues" to address in the motion to suppress). Outside of these instances, the officers questioned Cortner about that night without controversy. *See* Gov't Exh. 1 at 59:22–1:06:55.

Detective House testified at the hearing that, at certain moments, he raised his voice at Cortner while questioning him. Doc. No. 143 at PageID 817–18. When Cortner stated that he did not notice that a coffee table in the basement of the house was covered with thousands of dollars, Detective House yelled that Cortner was "f–cking playing games" and expressed disbelief that he did not "see a f–cking coffee table full of thousands of dollars" in front of him. Gov't Exh. 1 at 1:07:45–1:08:20. Detective House also raised his voice when he asked Cortner about the gun he owned, which he stated "was identical" to the one used to kill Officer Del Rio. *Id.* at 1:09:37–:55.

Detective House further asked Cortner if he would be willing to give the police a DNA

4

sample, using a cotton swab to swab the inside of his cheek. *Id.* at 1:16:13–:39. After expressing, again, that he had nothing to do with the drug dealing at 1454 Ruskin Road or Officer Del Rio's death, Cortner agreed to give a DNA sample. *Id.* at 1:16:39–1:17:08. But once Detective House offered Cortner the swab and instructed him, Cortner paused. *Id.* at 1:17:21–:28.

Cortner then stated, "I have nothing to hide. I just– this right here is kind of making me– I don't know if I need a lawyer for that." *Id.* at 1:17:18–:42. When Detective House moved to put the swabs back, Cortner hurriedly said, "No, no, no, no" while shaking his hand. *Id.* at 1:17:40–:42. Detective House then told Cortner that the co-defendants in this case agreed to give DNA samples. *Id.* at 1:17:42. After this, Cortner quickly told Detective House that he was willing to take the swab. *Id.* at 1:17:50–:57.

Shortly after Cortner swabbed his mouth, Agent Buzzard asked him if he has ever touched Goddard's[2] firearm—which was used to shoot Officer Del Rio. *Id.* at 1:18:42. Cortner replied that he was not aware that Goddard had a gun. *Id.* at 1:18:42–:51. Detective House interjected, asking if Cortner bought the laser sight on Goddard's gun; Cortner denied this, prompting Detective House and Agent Buzzard to ask him about this further. *Id.* at 1:18:51–1:19:00. Once Detective House stated that Goddard told him that Cortner was the one who bought the gun and the laser, Cortner stated that, "I only know about my gun, sir." *Id.* at 1:19:01–:09.

Detective House further probed Cortner's answer, noting that Goddard's gun was set up the same as Cortner's, both with extended magazines and laser sights. *Id.* at 1:19:09–:20. Cortner gave the same answer. *See id.* Growing frustrated, Detective House raised his voice and asked again. *Id.* at 1:19:20–:54. After Cortner refused to answer, Detective House asked, "Should we

---

[2] As mentioned, the Court presumes the reader's familiarity with the underlying facts. *See, e.g.*, *Goddard*, 2022 WL 1569985, at *1–3. Goddard is a co-defendant in this case and is accused of firing the lethal shot that killed Officer Del Rio. *See id.*

5

take it by your reluctance to answer that that's a 'yes'– that you did?" *Id.* at 1:20:10–:40. Cortner replied, "I choose not to answer that question, sir." *Id.* at 1:20:40–:42. Detective House acknowledged that answer, as Agent Buzzard asked, "What are you afraid of by answering that question? That's an easy question." *Id.* at 1:20:42–:48.

Cortner attempted to answer, but Detective House cut him off, stating that they can take his refusal to answer as an admission. *Id.* at 1:20:48–1:21:00. Agent Buzzard, for the next thirty seconds, proceeded to express puzzlement about the alleged inconsistency between Cortner's and Goddard's answers to this line of questioning, all while Cortner denied that he admitted anything. *Id.* at 1:21:09–:30.

Detective House moved on, saying that Cortner was "the only person [to] play games." *Id.* at 1:21:26–:28. This prompted Cortner to deny this, to which Detective House yelled, "The hell you're not! You didn't see the weed, you didn't see the guns, you didn't see the thousands of dollars you're sitting– [gesturing] this close to?" *Id.* at 1:21:29–:35.

Detective House further raised his voice to express disbelief at Cortner's story. *Id.* at 1:21:35–1:22:00. After the officers and Cortner argued about the placement of the money on the table, Cortner expressed frustration that the officers implied that he lied. *Id.* at 1:22:00–1:23:00. He then said, "If I was going to sit here and lie to you, sir, and not tell you– tell you the whole truth, I would have been [sic] told you I wanted my lawyer and lawyered up and told you nothing." *Id.* at 1:23:00–:09.

Agent Buzzard switched topics after Detective House once more admonished Cortner for "playing games," and the trio discussed where Cortner buys his guns. *Id.* at 1:23:09–1:24:30. After briefly asking about Goddard, the officers took pictures of Cortner standing against the wall, heard Cortner's recount of the police breach into the home, and ended their questioning. *Id.* at

6

1:24:31–1:29:48.

### B. Procedural History

Following his indictment, on January 21, 2022, Cortner filed the present suppression motion.  Doc. No. 126.  The Court denied his motion to suppress as to its challenge of the search warrant executed at 1454 Ruskin Road, but reserved its ruling on the portions of his motion addressing his statements made during questioning.  Doc. No. 139 at PageID 740, 752.  The Court held a suppression hearing on July 7, 2022, and received supplemental briefing from the parties thereafter.  Doc. Nos. 143, 144, 146.

## II. Legal Standards

"No person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V.  In *Miranda v. Arizona*, the Supreme Court declared "that custodial interrogation be preceded by . . . now-familiar warnings . . . and it directed that statements obtained in violation of these new rules may not be used by the prosecution in its case-in-chief."  *Vega v. Tekoh*, --- U.S. ---, 142 S. Ct. 2095, 2101 (2022) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).  These safeguards "ensure that the police do not coerce or trick captive subjects into confessing[.]"  *Berkemer v. McCarty*, 468 U.S. 420, 433 (1984).  These "familiar warnings," *Vega*, 142 S. Ct. at 2101, need only be given "[b]efore the police interrogate a suspect in custody," *United States v. Pacheco-Lopez*, 531 F.3d 420, 423 (6th Cir. 2008) (citing *Miranda*, 384 U.S. at 436).

This implies two components.  First, the defendant must be "interrogated," which includes "not only express questioning, but also any words or actions on the part of the police . . . that the police know are reasonably likely to elicit an incriminating response from the suspect."  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  Second, the police must hold the defendant "in custody," meaning "in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave."  *United States v.*

*Williams*, 998 F.3d 716, 736 (6th Cir. 2021) (quoting *Howes v. Fields*, 565 U.S. 499, 509 (2012)).

"Once *Miranda* rights are read, a suspect may either waive his rights or invoke them." *Id.* (citing *Berghuis v. Thompkins*, 560 U.S. 370, 381–84 (2010)). "[A] suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police." *Berghuis*, 560 U.S. at 388–89. "[A]n explicit statement of waiver is not invariably necessary to support a finding that the defendant waived" his or her *Miranda* rights. *North Carolina v. Butler*, 441 U.S. 369, 375–76 (1979). Rather, "[a] waiver . . . can be implicit, but an invocation must be explicit." *Williams*, 998 F.3d at 736 (citations omitted).

"It is the [G]overnment's burden to establish waiver by a preponderance of the evidence." *United States v. Adams*, 583 F.3d 457, 467 (6th Cir. 2009) (citation omitted). "To establish a valid waiver, the [Government] must show that the waiver was knowing, intelligent, and voluntary[.]" *Maryland v. Shatzer*, 559 U.S. 98, 104 (2010) (quotation omitted). "[T]he *Miranda* waiver inquiry ha[s] two dimensions: voluntariness and comprehension." *Garner v. Mitchell*, 557 F.3d 257, 263 (6th Cir. 2009) (*en banc*) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). "First, the relinquishment of the right must have been voluntary[,]" meaning "that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421. "Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*; *see also United States v. Crumpton*, 824 F.3d 593, 606 (6th Cir. 2016). "In assessing whether a waiver was knowing and voluntary, 'this court looks at the totality of the circumstances concerning whether a defendant's will was overborne in a particular case.'" *Crumpton*, 824 F.3d at 606 (quoting *Ledbetter v. Edwards*, 35 F.2d 1062, 1067 (6th Cir. 1994)).

8

Even if someone waived his or her *Miranda* rights, "[i]f an individual indicates in any manner, at any time prior to or during questioning, that he [or she] wishes to remain silent [or have their attorney present], the interrogation must cease." *Miranda*, 384 U.S. at 473–74; *see also Berghuis*, 560 U.S. at 395 (Sotomayor, J., dissenting). "A defendant's invocation of [his or] her right to remain silent[,]" *United States v. Calvetti*, 836 F.3d 654, 661 (6th Cir. 2016) (citing *Berghuis*, 560 U.S. at 380–83), and his or her "request for counsel must be express and unambiguous in order to require the cessation of questioning[,]" *United States v. Dupree*, 323 F.3d 480, 486 (6th Cir. 2003) (citing *Davis v. United States*, 512 U.S. 452, 459 (1994)). "Although a suspect need not speak with the discrimination of an Oxford don, he [or she] must articulate his [or her] desire to have counsel present [or to remain silent] sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney" or to remain silent. *Davis*, 512 U.S. at 459 (internal quotation marks omitted). When a defendant invokes his or her right to counsel, he or she "is not subject to further interrogation by the authorities" until consulting with counsel, "unless the accused himself [or herself] initiates further" contact. *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). If a defendant invokes the right to silence, the authorities may not interrogate him or her unless they "scrupulously honor[]" that invocation. *Michigan v. Mosley*, 423 U.S. 96, 104 (1975).

### III. Analysis

Cornter advances three arguments. First, he contends that he clearly and unambiguously invoked his right to counsel twice—first saying "I don't know if I need a lawyer for this" before taking the DNA swab; and then saying that, if he were lying, he "would have lawyered up" before talking to the police. Doc. No. 144 at PageID 845–46. Second, as to the questions about whether he bought the lasers that were on the firearm used to kill Officer Del Rio, he contends that when he stated that "I choose not to answer that question," he invoked his right to silence, so all

9

questioning had to cease. *Id.* at PageID 846. Finally, by yelling and swearing at him, according to Cortner, the officers unduly coerced statements from him. *Id.* at PageID 846–47.

The Government first argues that Cortner's statements about a lawyer were ambiguous, so the police had no duty to terminate the interrogation. Doc. No. 146 at PageID 857–58. Second, it agrees that Cortner's answers about the laser sight on the gun were inadmissible, but it contends that his answers to subsequent questions (or their functional equivalent), about matters not related to that topic, were admissible. *Id.* at PageID 859–61. Third, it notes that yelling and swearing at a suspect alone do not meet the high threshold for suppressing statements as coercive. *Id.* at PageID 861–62.

For the reasons below, the Court finds that Cortner's statements—aside from the answers about the laser sight on the gun contained in 1:20:01–1:21:30—were not elicited in contravention of *Miranda*.[3] Nor did the officers coerce Cortner into making these statements.

### A. Cortner's Waiver of his *Miranda* Rights was Valid

As a preliminary matter, the Court finds that Cortner fully waived his *Miranda* rights prior to speaking with Detective House and Agent Buzzard. Cortner first made an "express written . . . statement of waiver[,]" which "is usually strong proof of the validity" of waiver. *Butler*, 441 U.S. at 373. Cortner only signed these provisions after Detective House carefully went through the form, line-by-line, and informed Cortner about what rights he was waiving. *See* Gov't Exh 1. at 57:31–58:53. If anything, Detective House's further efforts—to ensure that Cortner knew what "coercion" meant—help prove that Cortner knowingly waived his rights. *See, e.g.*, *United States v. Ramamoorthy*, 949 F.3d 955, 965 (6th Cir. 2020) (upholding *Miranda* waiver where defendant

---

[3] It is not in dispute that Cortner was in custody, as he was not free to leave the City of Dayton Police Department. *See* Doc. Nos. 143 at PageID 828. Nor is it contested that Detective House and Agent Buzzard interrogated him. *Cf. Innis*, 446 U.S. at 301. The matters in dispute are only Cortner's waiver, his potential invocations, and coercion. *See* Doc. No. 143 at PageID 836–37.

signed the waiver form at each written explanation of the right and the officers verbally explained the rights to him). Considering Cortner's high school education, prior knowledge of *Miranda* warnings, and thorough colloquy with Detective House, nothing "suggest[s] coercion of 'such . . . gravity' that [Cortner] 'would have lost the will to resist'" the officers' interrogation. *Wesson v. Shoop*, 17 F.4th 700, 704 (6th Cir. 2021) (quoting *United States v. Haynes*, 301 F.3d 669, 684 (6th Cir. 2002)); *see also, e.g.*, *United States v. Binford*, 818 F.3d 261, 273 (6th Cir. 2016) (defendant who signed *Miranda* form acknowledging his understanding of rights, coupled with his prior experience with police, knowingly and voluntarily waived his *Miranda* rights). Thus, Cortner knowingly and voluntarily waived his *Miranda* rights.

### B. Cortner did not Unambiguously Invoke his Right to Counsel

Defendants can invoke their *Miranda* rights even after waiver. *See Miranda*, 384 U.S. at 473–74. Nonetheless, while Cortner did not need to "speak with the discrimination of an Oxford don" to invoke his right to counsel, his statements—in context—were too ambiguous to invoke that right. *Davis*, 512 U.S. at 459.

The Supreme Court and Sixth Circuit have declared similar statements ambiguous. In *Davis*, the Supreme Court found that the statement, "Maybe I need a lawyer," was too ambiguous to apprise a reasonable officer of whether the person invoked their right to counsel. *Id.* at 455, 462. Likewise, in *United States v. Potter*, the Sixth Circuit found that even though the Defendant "may have mentioned an attorney," this did not mean he unambiguously invoked his right to counsel. 927 F.3d 446, 451 (6th Cir. 2019). Importantly, in *Potter*, the Defendant "never requested to actually have an attorney present and never once said that he wanted to stop the interview to wait for one." *Id.* (cleaned up).

Cortner's initial statement before giving a DNA sample—"I don't know if I need a lawyer"—was "just as equivocal as the statements from *Davis*" and *Potter*. *Potter*, 927 F.3d at

11

451. First, "I don't know if I need a lawyer" is too ambiguous alone to place an officer on reasonable notice that the defendant seeks to end the interview right then and there. *See, e.g.*, *Ledbetter*, 35 F.2d at 1070 ("It would be nice to have an attorney" was too ambiguous). Second, immediately after uttering, "I don't know if I need a lawyer," Cortner repeatedly said "No" to Detective House—expressing his intent to take back his prior statement—before agreeing to the DNA swab. *See* Gov't Exh. 1 at 1:17:18:42. Cortner's actions belie his arguments here, as the context (coupled with his ambiguous wording) would not apprise a reasonable officer that he intended to terminate the interview to speak with counsel. *Cf. United States v. Adams*, 820 F.3d 317, 323 (8th Cir. 2016) ("I don't want to talk, man," when followed immediately by the defendant's voluntary exchange with his questioner, was an ambiguous invocation).

The same is true of his statement that, "I would have been [sic] told you I wanted my lawyer and lawyered up and told you nothing." Gov't Exh. 1 at 1:23:00–:09. The context makes it clear that Cortner said this not to terminate the interview, but prove to the officers that he was forthcoming. Any reasonable officer hearing Cortner speak would come to the same conclusion: Cortner wanted to continue speaking without a lawyer to show that he was telling the truth. *Cf. United States v. Mays*, 683 F. App'x 427, 433 (6th Cir. 2017) ("I really should have a lawyer, huh?" was not made with "sufficient clarity" that expressed intent to end the interview); *Adams*, 820 F.3d at 323.

Accordingly, Cortner did not unambiguously or unequivocally invoke his right to counsel.

### C. Cortner's Partial Invocation of his Right to Not Answer One Question did not Require the Police to Stop Interrogating him About Other Topics

Cortner contends—and the Government admits—that he unequivocally invoked his right to silence when he said, "I choose not to answer that question, sir." Doc. No. 144 at PageID 846; Doc. No. 146 at PageID 859–61; Gov't Exh. 1 at 1:19:54–1:21:30. Moreover, both acknowledge

12

that Cortner's subsequent answers to Agent Buzzard and Detective House's interrogation as to the laser sight on the gun (*i.e.*, the same subject matter) are inadmissible in the Government's case-in-chief. *See* Doc. No. 144 at PageID 846; Doc. No. 146 at PageID 861.

However, the Government argues that Cortner's responses regarding different subjects—such as the money on the table—after his invocation are admissible. Doc. No. 144 at PageID 859. It reasons that Cortner only partially invoked his right to silence, so a reasonable officer would not be apprised that Cortner intended to cut off all questioning. *See id.* at PageID 859–60. Thus, this was not a demand to terminate the interrogation entirely. *Id.*

The Court agrees. In *United States v. Hurst*, the Sixth Circuit upheld the admission of a defendant's statements made to police after he acknowledged that he understood his *Miranda* rights and stated, "he was willing to answer only specific questions." 228 F.3d 751, 759 (6th Cir. 2000). The defendant, at one point, indicated that he did not want to answer questions about possessing stolen firearms. *Id.* The police then stated, "we've got good information on you," in response, referencing the burglaries that the police had initially investigated the defendant for. *Id.* The defendant answered about the burglaries—moving away from discussing the stolen firearms. *Id.* Because the "defendant was aware of his *Miranda* rights and expressly agreed to answer specific questions, his refusal to answer a question about stolen firearms, viewed objectively under the circumstances, c[ould] hardly be deemed a clear and unequivocal assertion of his right to remain silent in response to any subsequent questions[,]" according to the Sixth Circuit. *Id.* at 760.

*Hurst* is controlling here. Cortner's desire not to speak about the laser sight during that brief exchange—coupled with his previous agreement to speak with the police "to a certain extent"—fell within *Miranda*'s protection of "refusal to answer specific questions." Gov't Exh. 1

13

at 58:55–59:00; *United States v. Williams*, 665 F.2d 107, 109 (6th Cir. 1981) (first citing *Grieco v. Hall*, 641 F.2d 1029, 1034 (1st Cir. 1981); and then citing *United States v. Ghiz*, 491 F.2d 599, 600 (4th Cir. 1974))); *see Mosley*, 423 U.S. at 103–04; *McGraw v. Holland*, 257 F.3d 513, 518–19 (6th Cir. 2001). But that protection does not extend this limited refusal to all other subjects, as no reasonable officer would take this statement to be an "unequivocal assertion of his right to remain silent in response to any subsequent questions" concerning different subject matters. *Hurst*, 228 F.3d at 759; *see, e.g.*, *United States v. Jumper*, 497 F.3d 699, 704–06 (7th Cir. 2007) (partial invocation of right to silence required the police to stop inquiring about that subject matter, but not other topics). No *Miranda* violation, therefore, occurred when Cortner began discussing other topics shortly after his limited invocation. *See* Gov't Exh. 1 at 1:21:31–1:23:00.

Ultimately, since the Government agrees to not admit the aforementioned portions of the interview (1:20:01–1:21:30) in its case-in-chief, this issue is moot as to those portions. *See, e.g.*, *United States v. Peterson*, No. 20-20448, 2022 WL 3230424, at *1 (E.D. Mich. Aug. 10, 2022). For the remainder, however, Cortner's motion is denied because the officers' questions and his answers fell outside the scope of his limited invocation, so no reasonable officer would be apprised to stop the interrogation entirely. *See Hurst*, 228 F.3d at 759; *United States v. Miller*, No. 1:14-cr-278, 2015 WL 3540064, at *5 (N.D. Ohio June 4, 2015); *United States v. Sheltman*, No. 05-10355, 2006 WL 3779793, at *2 (D. Mass. Dec. 21, 2006).

### D. Cortner was not Coerced into Speaking with the Police

To conclude, the Court finds that police never unconstitutionally coerced Cortner. Determining whether a confession was coerced "is essentially the same as the test for" determining whether a *Miranda* waiver is voluntary. *Binford*, 818 F.3d at 271 (quoting *United States v. Redditt*, 87 F. App'x 440, 445 (6th Cir. 2003)); *see also United States v. Musaibli*, 575 F. Supp. 3d 870, 879 (E.D. Mich. 2021). Thus, the same considerations that justified a finding that Cortner was not

coerced into waiving his *Miranda* rights—*i.e.*, his education, experience, and complete understanding of his rights—apply with equal force here. *See, e.g.*, *Miller v. Fenton*, 474 U.S. 104, 117 (1985).

Cortner offers additional circumstances to consider: Detective House's shouting and coarse language. *See* Doc. No. 144 at PageID 846–47. These standing alone, however, do not meet the burden to suppress statements as improperly elicited by police coercion. *See, e.g.*, *McCall v. Dutton*, 863 F.2d 454, 460 (6th Cir. 1988) ("[I]t is well-recognized that mere emotionalism . . . [does] not by itself constitute police coercion" (internal quotation marks omitted) (citation omitted)). Considering Cortner's education, experience in the criminal justice system, and knowledge of his *Miranda* rights, these circumstances outweigh any slight potential that Detective House's occasionally aggressive style of interrogation—that he performed without physical or emotional abuse—overcame Cortner's will. *See, e.g.*, *United States v. Fowler*, 535 F.3d 408, 417 (6th Cir. 2008) (absent countervailing circumstances, high school graduate's confession was voluntary where he knew his rights and there were no signs of physical or emotional abuse). Thus, this simply "was not the 'rare' case in which the defendant 'can make a colorable argument that a self-incriminating statement was "compelled" despite the fact that the law enforcement authorities adhered to the dictates of *Miranda*.'" *United States v. Phillips*, 230 F. App'x 520, 523 (6th Cir. 2007) (quoting *Berkemer*, 468 U.S. at 433 n. 20) (finding agent's aggressive insinuations during an interrogation alone were not enough to make defendant's confession unconstitutionally coerced).

## IV. Conclusion

The remainder of Cortner's motion to suppress is **GRANTED IN PART AND DENIED IN PART**. Because it is undisputed that Cortner's statements made from 1:20:01 to 1:21:30 in Gov't Exh. 1 were elicited in violation of *Miranda*, that portion of the videotaped interrogation is

**SUPPRESSED** from use in the Government's case-in-chief.  However, the remainder of the motion is **DENIED** in all other respects.  The Court shall hold a telephone status conference with counsel on **October 25, 2022 at 10:30 a.m.** in anticipation of the January 9, 2023 trial.

    **IT IS SO ORDERED.**

Date:  October 4, 2022                         s/Michael J. Newman
                                                      Hon. Michael J. Newman
                                                      United States District Judge